Good morning. Good morning, Your Honor. My name is Anne Richardson, and I'm going to be sharing the argument with my co-counsel Peter Bibbring. I'm going to be addressing the disparate treatment portions of the argument, and he'll be addressing the disparate impact. And if we could, we'd like to split the opening argument about eight minutes each, and then have four minutes for rebuttal. We'll try our best to keep it that schedule. Your Honor, I think we need to take a step back and look at what happened in this case. The defendants in this case filed two motions in limine before trial, one to keep out post-complaint anecdotes and one to keep out pre-complaint anecdotes. Essentially, they tried to form the entire focus of the trial on the period 1992 to 1994. Then what happened? The court granted and denied that in part, requiring that the plaintiff submit written proffers of any testimony that was going to go outside of that time frame. The court did somewhat inconsistently also permit testimony to come in from 1988 to 1994, but at times required that it be within the liability time frame. The next thing that happened was that in the defendant's case in chief, they presented six witnesses who were all very high-level employees of the CHP, from the very highest level, the deputy commissioner, the two assistant commissioners, to testify about their entire ranking and their entire promotional history, as well as their special assignments for the entire time period. This was completely unknown to the plaintiffs. One thing that's important to note is this case, all discovery that was non-expert, had completed in 1996. The case was ready for the trial. This was allowed under the theory that this was background of the witness, if I recall correctly. That's what the court said. Well, isn't that a fair ruling? I mean, if somebody gets on the stand and says, I'm a commissioner, a deputy commissioner, were you born a deputy commissioner or did you start as an officer? That's true. In the normal case, I would agree with Your Honor that would be fair background evidence. But in a case where you have a pattern and practice of discrimination in promotions, you have a very different scenario. In that case, as the courts have said in Chang, Lam, and Gonzalez, evidence of minorities being promoted after the liability period is error, and it's very prejudicial error. It brings the cold statistical numbers to life. It gives the jury these six faces, all minority faces, to say they're not discriminating now. Commissioner Helmick was permitted to say, oh, if you look at the snapshots just from 92 to 94, that's, you know, that's not what we look like today. That's not what the CHP is today. And so I would say in this case, we have a pattern of practice, class action, failure to promote, it's really not fair. And those witnesses really were not brought up to say anything else. Their entire purpose of their testimony was what their pattern of promotions had been in their special assignments. The Court compounded this problem by excluding plaintiff's own evidence that went after the fact. There were many witnesses that plaintiffs attempted to get on through proffers that the courts, that the Court excluded. And this was critical to saying, okay, if they're going to get in their evidence that there have been promotions after the lawsuit, we want to say why. We want to point out that commissioners or deputy commissioners went to minority officers' houses and told them what the answers were going to be, that they could, in fact, give them help. And this also showed that the process was not so ironclad, that it couldn't be fooled around with. And the Court excluded that evidence. And it's that two-hit whammy that really resulted in the prejudicial error in this case. Theoretically, if neither side had gotten into it, you might have a different scenario, or if both sides had gotten into it. But here you had evidence going on in the defense case in chief without having the plaintiffs be able to explain that. And that was what was so devastating. As I pointed out, both Chang and Gonzalez were cases where this Court has reversed a trial because of the inclusion of this very prejudicial error. So it rises to an important level. This is not just some kind of harmless discretionary ruling that the Court made. On the pre-liability evidence, this Court, again, has held in Obrey v. Johnson anecdotal evidence of past discrimination can be used to establish a general discriminatory pattern in an employer's hiring or promotional practices. It may prove inadmissible in an individual case, but when you have a pattern in practice case, it's critical to have evidence before the liability period that can help to show intent. The Court said in Hain v. Caruso, again, this evidence is critical because the plaintiff has the burden of showing that you must disbelieve the employer's own motives. So they have to show that what the employer is claiming about why they promoted as they did is not true. My impression is the judge did allow some pre-liability period anecdotal evidence in. Very important point, because the Court allowed very minimal. There were no racial slurs allowed from Medders or Lockley. The only evidence that they pointed to that I can find in the record that was allowed in were promotional history, were just the how long it took them to get to sergeant, how long it took them to get to lieutenant. That was permitted back regularly by both sides. But the comments, the use of the N-word, use of wetback, dumb Mexican, these are things that happened in the mid-'80s in Clyde Lockley's case. He would have testified about Ed Gomez. Okay. I understand that, but, I mean, that's a discretionary call on the part of the judge, isn't it? Some other judge might have allowed it, but this judge weighed it and concluded that it's remoteness, it's prejudice outweighs its probative value. That's a very important point, too, because the Court did not really make a 403 holding, a ruling on any of these judgment calls. She kept saying it's outside of the relevant time period. Let's move to a more relevant time period. Well, she may have given you the bottom line without articulating her thought process, but that's basically what she's ruling, isn't it? Well, I would say two things. One, she would ask the question, for example, Clyde Lockley, she was all set to allow the testimony to come in about what Ed Gomez, a decision-maker, had made about Hispanics. And then she said, I'll let you have that testimony come in. What time period was it? Well, he retired in 1992. It's not going to come in. So her ruling were really pinned to the time frame. And I would say either one of these would be grounds for reversal, but the combination of both allowing in the defendant's pre- and post-liability and the defendant's not allowing the plaintiff's was what really resulted in an error in this case. I'm going to call my co-counsel to address disparate impact. Thank you. Good morning. Good morning. Peter Bebring for Plaintiffs, Your Honors. The District Court committed three errors in its written decision on Plaintiffs' disparate impact case. First, and most fundamentally, the Court applied the wrong legal standard in evaluating plaintiff's statistical evidence. In evaluating the statistical evidence of disparate impact, the District Court incorrectly required the far greater showing of disparity that's appropriate for disparate treatment claims. The Court did so by citing to this Court's case in Gay v. Waiters, which was an intentional discrimination case in which the Court expressed that discrimination, intentional discrimination, where standard deviation showed disparities in the range of one to three. Now, it's ironic that the Court, in fact, cited to the standard articulated in Gay because, in that opinion, this Court took great pains to distinguish the standard of proof between disparate impact cases in which the fundamental claim is that a selection procedure causes a disparity and the statistical proof of a disparity is direct proof of the claim and disparate treatment cases in which the claim is discriminatory intent and proof of a disparity is only circumstantial evidence of that intent. And, indeed, in the section of Gay that is not cited in the briefs directly, the Court rejected the Waiters' argument that the two standard deviation threshold of statistical significance that is accepted by social scientists and both experts in this case was sufficient for intentional discrimination, reasoning that the Waiters made an error in, quote, taking a quantitative approach to the question of inferring discriminatory intent from statistical evidence. Their purely statistical analysis would almost completely blur the distinction between impact and intent, thus eliminate the legal difference between disparate impact and disparate treatment lawsuits. This would be both improper and unwise. But this is exactly what the District Court did here. The importance of this is twofold. First of all, if this Court were to affirm the District Court and repeat the application of the disparate treatment standard in Gay to the disparate impact evidence, it would destroy the careful distinction that the Court in Gay drew and that cases since have followed between disparate impact and disparate treatment. It would create confusion in the courts between the standards of proofs in certainly disparate impact in arguably both of those cases. Second of all, the error in governing standard here requires that this Court vacate and remand for further fact-finding. As the Supreme Court instructed in Pullman v. Swindt, which is cited in the reply brief, where findings are infirmed because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue. Although there are additional factors here, we can't know how the Court would have balanced those factors under a correct standard. And it's a very different thing to evaluate statistical evidence and the Court's other concerns under the standard of Eldridge and Bowman and even Contreras, where two standard deviations is taken as sufficient proof of a fact, on the one hand, from the evaluation under the disparate treatment, where courts regard with caution disparities of one to three standard deviations. Even if she were wrong about the significance of the standard deviations, I get the impression from her ruling she didn't put a whole lot of stock in your experts' methodology. Isn't she as the trier of fact entitled to say, I don't buy it? Even if I bought it, it doesn't measure up. Okay, we'll concede that one. But we get the first hurdle. First, that's absolutely correct, Your Honor, that there were additional factors that the Court relied on. But when plaintiffs made a motion to amend the judgment, the findings of fact and conclusions of law, to reflect the proper standard, the Court adhered to that standard. It explicitly did not say, well, even if I evaluated under the standard you're asking for, I would have reached the same result. And it's exactly that balancing test that this Court is not in a position to do, as the Supreme Court has instructed in Fulman. Mr. Biering, what do we do with the district court's criticism of Mr. Biddle? She found on page 26 that his statistical evidence was unreliable, and therefore that Mr. Biddle was entitled to little weight regarding his conclusion that the promotions had a disparate impact on non-whites during the liability period. Is that finding clearly erroneous? Well, portions of it are clearly erroneous, and portions of it, indeed, are actually errors in a matter of law. First, and getting back to the three errors that the Court made, the second error was discounting plaintiff's evidence based on the failure to introduce statistical – sorry, the calculations and underlying data. Indeed, that's – the Court rejected the testimony of both experts, defense and plaintiffs on that ground. Was it an error to do both – to discount the data for both experts? It was. What the district court did – and, in fact, defendants agree in their brief that recourse to the data – this is at page 41 of their opposition brief – that recourse to the data would not have resolved any of the issues in dispute, and that the district court was not clear about why it needed recourse to the data. Although there were flaws in the data – Well, didn't she have it? Was there a concern? I mean, frankly, I find her opinion totally confusing myself. I think she completely misapplied the law under Title VII, the McDonnell-Douglas test, and several other things, and I find the whole thing confusing. But wasn't she trying – I think she was trying to find a way to compare apples to apples between the two experts. And she wasn't able to do that because they had used different data points, and so she felt the need to see this data. And ultimately, because neither one of them did it – and this is another wrong application of the law, because experts aren't required to do that – but because neither one did it, she discounted both experts, which resulted in this kind of crazy finding that there's no prima facie case, but even if there were, there's no rebuttal. That's right. And while the district court may have had concerns with the data that I'll get to in a second, the rule that she imposed by requiring introduction of data, if this court were to affirm that, it would create the rule that Your Honor suggests rightly does not exist, that experts must always introduce their facts and underline their – Didn't say you had to introduce it. She just said, because you didn't, I don't – it goes to the weight I'm going to give it. Why isn't that proper? Well, would have to introduce – You don't introduce it at your own peril, you know, is what she's saying. Exactly. So because expert testimony is always contested in any vigorously litigated cases, as a – If you're smart, you'll prove it, especially if you know your judge. I mean, just like when you call your expert witness, you don't have to establish their credentials, but you do, because it makes them more probative. I mean, if you don't introduce the data, and especially she sent out an order saying I want the data. Well, there are two points there. First of all, it's exactly the – the problem here is exactly that it wasn't probative. Neither side suggests that the data was probative. The order that the court sent out asked for references in the record to the data. Because there had been disputes about certain flaws in the data, both sides interpreted that as a request for references to what data had been used for particular calculations, not an invitation to submit additional evidence. With respect to the court's two other substantive concerns about the data, this is the 100 percent pass rate on the 1990 – sorry, since the 1991 lieutenant's exam. That, first of all, is clear error for several reasons. First of all, plaintiff's expert Biddle testified that – this is at excerpts of record 603 – that he used corrected data for these analyses. And indeed, defendants on the morning of closing at – this is at Appellee's supplemental excerpts of record at 207 to 208 – admitted that he had performed analyses on corrected data and that they were not objecting to comment on those analyses. Second of all, their expert, Mr. Ward, at excerpts of record 658, testified that an erroneous showing of 100 percent pass rate wouldn't create a disparity. The disparity is created by different pass rates for different minority groups, and therefore an error that shows 100 percent pass rate for everybody doesn't create a false showing of disparity. With respect to the last issue, the flawed data of – from the SBB that had the improper other identifiers for race where race could not be determined, the district court erred as a matter of law by drawing an inference against plaintiffs for defendants' failure to keep records. And I see my time is up. I reserve the remaining time for rebuttal. Thank you, Mr. Beeper. Judge, we probably had a question. One last question. The district court also faults Mr. Biddle for using single-pool analysis rather than multi-pool analysis. What's your response on that? Mr. Biddle repeatedly uses multi-pool analyses. And contrary to defendant's suggestion, none of that testimony was ever – But your claim is that she's clearly erroneous on that, that her characterization of him is only using single-pool, claiming that Mr. Ward apparently testified extensively as to the use of multi-pool versus single-pool. It's actually not so much that. The district court, in fact, recites in her order a host of multi-pool analyses Biddle performed. She faults him for not performing multi-pool analysis on, one, the overall supervisory promotions during the liability period. Although he provided multi-pool analyses for the individual sergeant's written examinations, which showed disparate impacts in the range of two for the – two to three for the individual examinations, in the range of four for the combined examinations from 88 through 94, he performed multi-pool analyses on those. He also performed the multi-pool analysis on the overall promotions rate from 1988 to 1994. So the failure to provide the multi-pool in that one figure, overall promotions in the liability period, should not prevent this court from finding disparate impact on either the written exams, generally, or indeed promotions based on the larger time period. Judge Ward will ahead a question. Well, my question was just to follow up on this. The problem that she pointed out with the data that the State kept where they had – I guess it was white and then other instead of being broken down by a race. They had an other slot on the form, is my understanding. So they had various ethnicities, but also had an other slot. So for a category of people who chose that other slot, their race could not be determined. But what the category – what was being compared was whites versus non-whites. So if you're other, wouldn't you be a non-white? Well, the plaintiff's expert indeed did analysis two ways, both by counting, as Your Honor suggested, those as non-whites and also by excluding them altogether. And the district court nonetheless drew an adverse inference against plaintiff's expert's credibility. We'll make sure you get some more rebuttal time. Thank you. Good morning. Good morning. My name is Joel Kine. I represent the California Alley Patrol. May it please the Court, I'd like to address the treatment points that were made, but I'd like to go to this one impact point that was made with regard to the multiple pool, single pool. The centerpiece of the plaintiff's case on disparate impact is the 2.18 standard deviation that Biddle testified to. With regard to that analysis, he only performed a single pool analysis. It's unrebutted. The centerpiece of their disparate impact claim, the 2.18, he only performed the single pool analysis. That methodology is outdated and has been rejected by the profession. It's bad science. And that's what Dr. Ward testified to. If you go to a surgeon and you need knee surgery, you better hope that he's not going to apply a procedure that was used 15 years ago for knee surgery. It's like any other science. The science has evolved over time. And the statistical methods that Dr. Ward used are the state of the art with I'd like to go back, unless the court wants to stay on the impact claim, to the treatment claim. This was a very long trial, 27 days of testimony. The district court judge made numerous evidentiary rulings throughout the trial. Prior to the trial, she communicated to the parties the ground rules. And the ground rules were quite clear. 1988 to 1994, that evidence was presumptively going to be allowed, that type of testimony, that type of anecdotal evidence. But it wasn't an absolute rule. Because what she said was, if you're going to come forward with evidence outside of that time frame, I'm going to analyze it on a case-by-case basis. Those were the rules of the road, and those rules were applied consistently throughout the 27-day trial to both sides. What the plaintiffs have done here is selective distortion of the record. They've taken a few witnesses and snippets of their testimony, and they've argued that somehow District Judge Marshall abused her discretion on these evidentiary rulings. Quite to the contrary, quite to the contrary. Most of the points they make regarding our testimony was not objected to. I think it's quite clear from the record. Most of the testimony that they're objecting to was not objected to. Number two, most of the objections that they made with regard to our evidence were sustained. I think if you're going to balance this, you will see, if anybody would care to read through the entire trial transcript, that most of the rulings, most of these evidentiary rulings, went against the defendant. She established parameters, and she consistently applied those parameters. That is the role of the district court judge. We didn't like a lot of it, I can tell you that. But those were the rulings. Now, I don't think it makes a whole lot of sense to go through all the testimony, but I just want to highlight for the Court a few of the witnesses that we presented with regard to this so-called post-complaint evidence. And I think the Court has appropriately characterized that as background evidence. The substantive testimony that we presented had to do with the liability period, as defined by the district court and as she instructed the jury. But when the witnesses took the witness stand, they talked about their employment history at the California Highway Patrol. The trial was in 2003. The liability period was 10 years earlier. So, yes, people did get on the witness stand and say, I was a lieutenant, I was promoted to captain, I was promoted to assistant chief, et cetera. Commissioner Hannigan testified. The testimony was not objected to. Farrow, no objection to the testimony. Houston, no objection to the testimony. Williams, no objection to the testimony. Anderson, no objection to the testimony. Plaintiff's witnesses. Lockley, he testified about comments that were made in 1980 or 1981. Ramos, plaintiff's witness, he testified about events in 1976 and 1978. Casey testified that he wasn't promoted after 1970, 1974, and 1976 sergeant's examinations. And Mr. Page testified that he failed and was not promoted after examinations in 1968, 1970, 1972, 1974, 1981, 1988, and 1990. There was no abuse of discretion. The court listened to the evidence. She listened to the arguments of counsel. She weighed the evidence. She weighed the potential prejudice, and she made appropriate rulings. The argument is completely meriless. Let me address the impact claim. The court, and Judge Ward, I'd like to just make one comment regarding a comment you made. The McDonnell-Douglas test has no application to a class claim. McDonnell-Douglas only applies where you have an individual claim of discrimination. That paradigm has no application where there is an allegation of a pattern of practice. That's teamsters, as set forth. So why did Judge Marshall apply it? Well, I think it was wrong for her to apply McDonnell-Douglas. I don't recall that actually in her opinion on the impact claim, but if she did. You don't recall it in her opinion on the impact claim? I don't recall her applying the McDonnell-Douglas test. Well, you did. That's exactly what she did. Okay. Well, that was not the appropriate test. Right. But what she did was, and the thing that was absolutely correct, was she considered the totality of the circumstances regarding the statistical evidence. This was not a case with regard to the plaintiff's proof where the evidence was uncontested. Every aspect of their testimony with regard to, or of their evidence with regard to the statistical evidence was contested. And she looked at the totality of the circumstances. Let me follow up on Judge Wardlow's question, make sure I'm following this. I understand that her ruling said something to the effect of, at the close of all the evidence, I find that the plaintiff didn't prove a prima facie case. Correct. But if I'm wrong about that, I find that the defendant didn't rebut the case. Correct. This is the burden-shifting thing that I think Judge Wardlow is asking about. Are you saying that that was error on her part to couch her order in those terms? No, not in those terms. In an impact case, in an impact case, the plaintiff has to establish a prima facie case. That is done in almost every instance with statistical evidence. Then the burden shifts to the defendant who has an opportunity to rebut the prima facie case. That is, rebut the statistics. You can do that in multiple ways. It can show that the statistics are not reliable. It can show that the expert witness is not credible. It can disparage the statistics through briefing or argument. We did all three. So that's the rebuttal that the defendant has an opportunity to present. Now, if that's unsuccessful in an impact case, then the burden of proof shifts to the defendant to show job-relatedness. In other words, you've now demonstrated that there is a specific employment practice that's had a disparate impact. You've done that through statistical evidence. The defendant has been unable to show that that statistical evidence should be rejected for any reason, in which case the defendant then has the burden, if it's going to prove the affirmative defense, of showing job-relatedness and business necessity. That is the paradigm that's used in a pattern and practice case. This Court has addressed it on numerous occasions. Of course, the Supreme Court has addressed it in Watson and other cases. That's the paradigm. I think that's what she was doing. I'm fairly certain that's what she was doing because this has been briefed numerous times, and as you know, it's been up here before, twice. So on the impact claim, that was what she did. But in evaluating the evidence, in evaluating the statistical evidence, what did she do? She looked at all the circumstances. With respect to the 2.18, Biddle used only the single pool method. Bad science. We rebutted, we at least put on evidence that we thought rebutted, the underlying statistics because Dr. Ward testified that with regard to his various analyses, either the data was missing race information, which was true for the 1988 and 1992 sergeant's written. I just want to, if I can step back for one second, I want to make sure the Court understands the distinction in the promotional examination process between the written test and the oral component. The sergeant and the lieutenant's test had two pieces in effect. There was a written test. If you passed the written test, you then went to the oral interviews. If you didn't pass the written test, that was the end of it. You didn't go to the oral interview. That was the end of the process. So there was a two-step process for the sergeant's examinations and the lieutenant examinations. The captain, deputy chief, and assistant chief examinations were only the oral interview. So what Biddle did was he kind of tried to mix and match. He looked at some of the written tests, and he tried to combine those, and he looked at some of the entire examinations, and he tried to combine those. The 2.18 goes to eight examinations, total examinations, that Biddle analyzed. And for that analysis, he used the single pool method. It also fails Title VII because in an impact claim, it's the plaintiff's burden to identify the specific employment practice that's caused the alleged impact. When you have a combination of eight separate examinations with multiple parts, you fail that statutory requirement. So it failed for that reason as well. It also failed because the underlying statistics were not reliable. It had missing race information. He used some tests where everybody was shown to have passed. It doesn't really matter whether because everybody passed, everybody was treated equally. The point is, the salient point is that the statistics were bad. It was bad science, and it was bad statistics. She evaluated the testimony, all of it. She heard Dr. Ward's testimony. She heard what Biddle did, and she listened to the cross-examination. I know the court requested before argument the trial testimony of both Mr. Biddle and Dr. Ward. Having read that, you know that at cross-examination, Mr. Biddle admitted, admitted that statistics were incorrect in a number of instances. Her findings were not clearly erroneous. As the court knows, that is the most deferential standard that's provided to the trial courts. She did exactly what she was supposed to do as a trial judge. She looked at the totality of the circumstances. This was not a case where the statistical evidence was unrebutted and came out, lo and behold, a 2.18. I don't understand her repeated findings that, citing Gay, that, for example, furthermore, even if the court had the underlying data to support these conclusions, the court finds that a standard deviation of 2.05 using the multiple poll approach, or 2.29 using the single poll approach, is not substantial enough to infer causation. There's two problems with that. First of all, well, there's three. First of all, both experts agreed that 1.96 was a sufficient standard deviation, so on its face it would be. Secondly, both analyses are presented, single poll and multiple poll, and both are beyond the standard deviation. Third, this is a disparate impact case. She's relying on Gay. And fourth, she's taking the statistics, the standard deviations, and relating them to causation as opposed to relating them to whether there's a discriminatory practice. Let me see. I can address each of those. Okay. First of all, 2.18, as I started out by saying, was only single poll. Okay. Well, listen, I'm quoting from her findings, so I know it's 2.18. I'm not referring to that. I'm referring to her 2.05, using the multiple poll approach, or the 2.29, using the single poll approach. The causation issue, I can address that, and then I'll address the numbers. The causation issue is actually quite straightforward. It is causation. It's causation because what you have to do is- No, it's not causation. When you're looking at disparate impact, disparate impact is the way that one goes to prove that there was discrimination. The causation, it's something else. You look at what is the allegedly unlawful employment practice. And here the allegedly, I'm assuming, I mean, the analysis is not in there, but assuming that the allegedly unlawful employment practice was using a test or a combination of tests and eligibility lists that by a statistically significant measure had a disparate impact, resulted in fewer minorities being promoted in a substantial way than whites. Okay. So she should be, instead of talking about causation, she should be talking about a discriminatory effect. I think that we're having a semantic difference only. The burden of the plaintiff is to show that a specific employment practice causes a disparate impact. That's the causation. Right. You have to identify a practice, and that practice has to cause, or has to be a direct relationship, has to cause impact. There's causation. And so if you identify practice A, okay, that has to result in an impact, not practice B. So that's all she was talking about there. With regard to the two standard deviations, it's not enough. I mean, it certainly is not the case that a plaintiff can come in with an expert witness and say, we've looked at this practice, and it's 2.5 standard deviations, and now I'm going home, and we've shown disparate impact. You have the right to explore the testimony. What's it based on? If it's based on bad evidence, bad numbers. You've said bad science like five times. This isn't a jury. This is an appellate argument. I know, but I'm not saying that. I'm talking about the underlying evidence now. I'm talking about the underlying evidence that was used here. He used data that was not accurate. We gave them accurate information back in the 90s, 1997, I believe. For whatever reason, he didn't use it. On cross-examination, he admitted he didn't use it. And that's why she discounted it. And that's why she discounted it. There's nothing wrong with that. That's exactly how these cases are typically tried. Let's contrast that with Dr. Ward. None of his underlying data was contested. And this is why I think what's good for the goose, good for the candor, doesn't really work here. Because if it's uncontested, I don't think there is a need to put in the underlying data or even the underlying analyses. Because it's uncontested. It's unrebutted. That is really night and day here. And if the trial record doesn't make that clear, I don't know what else can. Dr. Ward testified. The dispute that the plaintiffs have with Dr. Ward is not with any of his underlying data. It's with the fact that he used some information that was after the filing of the lawsuit. And by the way, that was entirely appropriate. Because all that Dr. Ward did was he looked at the ten examinations that had an impact on the liability period. The eligibility lists that he analyzed were all in place before the lawsuit was filed. And then it was just, it ran itself. It was a machine running itself. There was no human intervention. You established the eligibility list, and then you went down the eligibility list. That's what Dr. Ward did, and that was entirely appropriate. Mr. Cohen, I see you're out of time. Thank you very much. Thank you very much. Thank you, Your Honors. I'll be very brief. On the disparate treatment, counsel says that the court established the rules of the road before the trial started, but those rules were not applied equally to defendants. They were not required to give a written proffer, for example. Plaintiffs didn't know what their witnesses were going to testify about. When Joseph Ferro testified about his promotions, he went through all of his promotions to the present day without giving a time frame. And then counsel finally said, plaintiffs said, I would offer an objection as to time frame. What time is this? And only at that time did the witness reveal that they occurred in 2000, 2002. Counsel repeatedly objected. We've got the references in the record. Moreover, the court specifically had said at ER 615 that people could testify about what happened to them subsequently, they just couldn't tie it to the lawsuit. And that, again, is where this error was compounded. Once the testimony had gotten in, surely at that point the plaintiffs should have been able to present their rebuttal testimony about why these promotions happened and the fact that they were tied to the lawsuit, but the only reason that Anderson, for example, had been promoted was because of the lawsuit. That testimony by Lisa Sowell was kept out. So, again, I just wanted to make those few points, and I'll let my counsel address the different impact. Thank you, Your Honors. I see that I'm already out of time. We'll give you a couple of minutes. Okay. Thank you very much. First, with respect to the totality of the circumstances, of course it's true that the district court did evaluate the totality of the circumstance, but the court must evaluate the totality of the circumstances under the correct standard, and if it does not do that, this court must remand for fact-finding under the correct standard. And the court cannot make errors of law in the wrong standard. And the wrong standard was what exactly? The wrong standard was the standard this court articulated in Gay, where standard deviations in the range of 1 to 3 are treated with extreme caution. That's a very different standard, implying that unless it's supported by other evidence, no inference of discrimination will be drawn because it's an inference of intent. What about her order that says, I find you didn't prove your prima facie case? Was there any error in the way she formulated it? I know you don't agree with her finding, but I mean, any error in the way she formulated her reasoning? In the – I understand the court's – that her analysis of prima facie case and then looking to statistical rebuttal, I'm not sure that – I understand the way that she formulated that, and I think that that is actually consistent with the general disparate impact inquiry, although she may have borrowed language from McDonnell Douglas. A second point. The 2.18 standard deviations is not the centerpiece of Plaintiff's claim. It's certainly important, but if you look at the record – if you look at the recitations in the district court's order, there were 2.9 standard deviations for the 1990 Sergeant Britton's, 2.39 standard deviations. This is multiple – sorry, this is not aggregated, so it's neither multiple nor a single pool. There's a multiple pool analysis that shows a 4.18 standard deviations on the Sergeant Britton exam. They're clear analyses that shows significant disparate impact on non-whites. And finally, with respect to the issue of this erroneous data, and particularly with the issue of the others, this is an error of law. I think it requires a little explanation. When we first received data in 1994, that data did have errors. Mr. Biddle testified on his direct that he noticed those errors but performed the analyses anyway because that's the data he had available. He was provided corrected data in 1997. He testified clearly that he used that corrected data and performed analyses and testified to those analyses in court, and defendants impeached him for his prior use of analyses of bad data that they had provided. So his testimony that he is with the 100% pass rate analysis, he used corrected data for that in the Sergeant's written exam, makes it clear error that the district court relied on his prior use to discredit him. Second, with respect to the use of others, the uniform guidelines clearly state that employers must keep records of the impact that selection procedures have on differing races. And while those uniform guidelines aren't binding law, the Supreme Court in Wards Cove was very careful and relied heavily on the existence of the uniform guidelines and those obligations in placing on plaintiffs the burden to prove statistically that there was a disparate impact. And for this court to find that a failure in defendants' recordkeeping can lead to an adverse inference against plaintiffs' expert would have two results. First of all, it would undermine the assumptions on which the burden placement is based in Wards Cove analysis. And second of all, it would create an incentive to employers simply not to keep adequate records because that would insulate them from liability. If your honors have no further questions. I just have one question out of curiosity, and it's the treatment case. The jury found retaliation, unlawful retaliation against Page, but found no damages. What's the explanation for that? That's a good question, Your Honor. It's not part of our appeal. We did not. I understand that. I'm just as curious about it. He had already retired at the time that the case went to trial, and I don't know the answer. Was there evidence put in of damages? I'm deferring to trial counsel since I was not present at the trial. I'm sorry. Randy Renick, and I was on trial counsel. I don't believe there was any evidence presented as to economic damages for the plaintiff, no. Okay. Thank you. Thank you, Ms. Richardson and gentlemen. The case is submitted. We'll stand at recess for the day. All rise. This court for this session stands adjourned.
judges: Silverman, Wardlaw, Bybee